IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

     Plaintiff,

v.

JAIQUAN JAHAI WHEELER (01),

     Defendant.

Case No. 17-40037-01-DDC

## MEMORANDUM AND ORDER

On March 14, 2017, law enforcement officers had a "parole absconder" arrest warrant for defendant Jaiquan Jahai Wheeler.  They executed the warrant at a motel room rented by Mr. Wheeler's wife, where Mr. Wheeler was visiting.  During the execution of the arrest warrant, law enforcement officers also searched the motel room twice without a search warrant.  Although Mr. Wheeler's papers refer to the search effort at the motel room as a single search, his arguments functionally divide this search into two searches.  The court thus refers to two distinct searches throughout this order.  The **first search** began with Mr. Wheeler's arrest and terminated when all law enforcement officers except the FBI officers left the motel room.  The **second search** began when Officer Salmon, a task force officer with the FBI, sought consent from Mr. Wheeler's wife to search the room.  In his Motion to Suppress (Doc. 15), Mr. Wheeler seeks to suppress evidence found during both warrantless searches of his wife's motel room.

The parties submitted their initial motion and response (Docs. 15 & 18). And Mr. Wheeler filed a Supplement to his motion (Doc. 23).  The court held a hearing on the motion on November 15, 2017.  At the end of that hearing, the parties requested time to submit supplemental briefs.  The court granted their request.  Mr. Wheeler has submitted the supplement

to his motion (Doc. 35).  And the Government has responded (Doc. 37).  After reviewing the

parties' briefs and analyzing the evidence presented, the court now is ready to rule.  For reasons

discussed below, the court denies Mr. Wheeler's motion.

I.      **Background**[1]

        In the early morning hours on March 14, 2017, law enforcement officers from the Kansas

Department of Corrections ("KDOC"), the Topeka Police Department ("TPD"), the Shawnee

County Sheriff's Department, and the United States Marshals Service stacked outside Room 371

of the Econo Lodge at 2950 South Topeka Boulevard in Topeka, Kansas.  These officers had a

"parole absconder" arrest warrant for Jaiquan Jahai Wheeler, the defendant here.  And they had

information that he was staying in Room 371 with his wife, Kendra Collins.  This information

proved correct, as Mr. Wheeler had arrived there around three that morning and was asleep in

this room rented by Ms. Collins.  Doc. 30 at 7 (Tr. of Nov. 15, 2017 Mot. Hr'g).

        Once the entry team was in place, KDOC Special Agent Richard Westgate, the officer

assigned to Mr. Wheeler's warrant, knocked on the door and announced their presence.  Officers

suspected that Mr. Wheeler already knew they had approached because the drapes on the motel

room had moved as someone peered out while the officers gathered there.  For a tense two

minutes, officers waited for Mr. Wheeler to open the door in response to Special Agent

Westgate's announcement.  But Mr. Wheeler did not come to the door, offering the excuse that

he needed to get dressed before opening the door.  Meanwhile, the drapes were pulled back at

least once more as someone peered out from inside the room.  Officers testified that they smelled

the odor of marijuana emanating from the room as they stood outside it.  *Id.* at 30 (Officer Scott

---

[1]     The court takes the background facts from the officers' testimony and Government Exhibits 1–8
presented at the November 15, 2017 hearing.  Exhibits 1, 2, and 3 contain footage from body cameras
worn by Topeka Police Department Officer Scott Koch, Shawnee County Sheriff's Deputy John Peterson,
and Shawnee County Sheriff's Deputy James Ward.

Koch testifying that he smelled marijuana as he approached the motel room), 66 (Deputy Sheriff John Peterson testifying that he smelled marijuana as he approached the motel room), 95 (Deputy Sheriff James Ward testifying that he smelled marijuana as he moved toward the motel room), 156 (Special Agent Joe Cox testifying that he smelled marijuana as he "went up to the [motel room] door."), 186 (Special Agent Westgate testifying that "[e]ven prior to walking into the motel room, I could smell a strong odor of marijuana coming from the room.").

After two minutes had passed without Mr. Wheeler opening the door as directed, the officers used a keycard to open it. *Id.* at 20, 72. Then, officers flooded the room; some gained control of Mr. Wheeler and Ms. Collins, while others conducted a protective sweep of the room. The officers who gained control of Mr. Wheeler and Ms. Collins immediately handcuffed them and moved them to the covered walkway just outside the room. Deputy Sheriff John Peterson from Shawnee County was the first man in the stack of law enforcement officers who entered the motel room, and he swept the room and the bathroom. During this sweep, he saw a bag of ammunition on the vanity and noticed that ceiling tiles as well as the top of the toilet tank were out of place. He testified that they looked like they had been disturbed recently. *Id.* at 76–77. KDOC Special Agent Joe Cox testified that he, too spotted the bag of ammunition on the vanity during this protective sweep. *Id.* at 147.

Officers continued their protective sweep and looked under the beds to ensure no one was secreted there.[2] Once they had secured the room, the KDOC officers—Special Agent Westgate, Special Agent Cox, and Deputy Director Richard Sackhoff—began to search the motel room. Deputy Sheriff Peterson and Deputy Sheriff Ward, from Shawnee County, assisted them with the search. Deputy Sheriffs Peterson and Ward testified that the KDOC officers led the search under

---

[2]    The officers had received information that the motel room may contain a second man. Doc. 30 at 44–45.

the authority granted by Mr. Wheeler's parole agreement.  *Id.* at 77, 95.  The officers testified

that this search produced two bags of marijuana found inside the toilet tank in the bathroom, an

electronic scale found behind an ironing board, a box of ammunition found in the drawer of the

nightstand, and a handgun found in Ms. Collins's purse—all located inside the motel room.  *Id.*

at 102–04 (Deputy Sheriff Ward testifying that he found two bags of marijuana inside the toilet

tank and an electronic scale behind the ironing board), 121–123 (Deputy Director Sackhoff

testifying that he found a box of ammunition in the nightstand and a firearm in Ms. Collins's

purse).

While this search was conducted, Officer Patrick Salmon and Special Agent Ian

Knooiheuizen from the FBI arrived.  And at some point, Ms. Collins was brought back into the

room.  When the search was complete, all evidence was left in the room and the searching

officers left.  Officer Salmon and Special Agent Knooiheuizen stayed in the room with Ms.

Collins.  Officer Salmon asked Officer Scott Koch to stay as well.  He wanted to use Officer

Koch's body camera to record the interaction with Ms. Collins.  *Id.* at 37.  Once the room was

clear of all law enforcement officers except Officer Salmon, Special Agent Knooiheuizen, and

Officer Koch, Officer Salmon explained Mr. Wheeler's arrest warrant to Ms. Collins.  He then

explained that the officers who were in the room had found some contraband in plain view.[3]

And then, Officer Salmon asked Ms. Collins to consent to a search of her entire room.  Ex. 1

(Koch #2.mp4 at 01:00–03:23)

She asked what would happen if she didn't give her consent.  Officer Salmon explained

that he would hold the room and apply for a search warrant.  He explained that her consent was

---

[3]    Officer Salmon summarized the contraband that other officers found in plain view during the
protective sweep.  He testified at the November 15, 2017 hearing that he believed the evidence was found
during the protective sweep, but later learned the search was conducted based on Mr. Wheeler's parole
conditions.  Doc. 30 at 189–90.

the quicker way, but she was free to decline consent. And Officer Salmon also explained that he didn't want her to consider whether they could secure a search warrant when she decided whether to give her consent. She ultimately agreed to consent. *Id.* at 03:23–04:35. But she had to use the bathroom before she signed the consent form and so, Officer Koch searched the bathroom before Ms. Collins used it.

After she used the bathroom, Officer Salmon filled out the consent form and read it to Ms. Collins. Ms. Collins was confused about why she had to sign the form—saying that she had never had to sign a form when she had consented in the past. Officer Salmon explained that the FBI liked to get consent verbally and in writing. Ms. Collins then said she understood and signed the consent form. *Id.* at 07:28–11:15.

Officer Koch then searched the room. Officer Koch testified that he found the two bags of marijuana inside the toilet tank, a bag of ammunition on the vanity, an electronic scale found behind the ironing board, a handgun found in Ms. Collins's purse, and a full box of ammunition found in the nightstand.[4] Doc. 30 at 30–31. He also testified that he found an empty box of ammunition in the trashcan. It matched the bag of ammunition found on the vanity. Officer Koch also found a small bag of marijuana inside the pocket of a red jacket. *Id.* at 31, 59.

Mr. Wheeler now seeks to suppress evidence discovered during these searches of Ms. Collins's motel room.

## II.    Analysis

Mr. Wheeler seeks to suppress this evidence because the searches, he argues, violated the Fourth Amendment. The issues raised by his argument begin with the requirement that Mr. Wheeler must establish that he has standing to object to the searches. *See United States v.*

---

[4]    During cross-examination, Officer Koch clarified that other officers may have found these items during the first search. But Officer Koch didn't know what other officers found because he was not present for the first search. So, he noted in his report that he found these items during his search, the second search. Doc. 30 at 59.

*Marchant*, 55 F.3d 509, 512 (10th Cir. 1995) ("In order to challenge the lawfulness of a search and seizure under the Fourth Amendment, a defendant must first establish his or her standing to do so." ).

### A.     Standing

To have standing, Mr. Wheeler must demonstrate that the searches affected his individual constitutional rights. *United States v. Rhiger*, 315 F.3d 1283, 1285 (10th Cir. 2003). To make this showing, he must "show that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable." *Id.* (citation omitted). "It is settled that a motel guest is entitled to constitutional protection against unreasonable searches of his or her room." *United States v. Owens,* 782 F.2d 146, 149 (10th Cir. 1986) (first citing *Stoner v. California*, 376 U.S. 483, 490 (1964); then citing *United States v. Anthon,* 648 F.2d 669 (10th Cir. 1981)). But here, Ms. Collins is the motel guest because she had rented the room from the motel. And the Tenth Circuit has not expressly recognized an expectation of privacy for unregistered guests in a motel room. *See United States v. Creighton*, 639 F.3d 1281 (10th Cir. 2011) ("We assume for the sake of argument that an individual like Defendant who, unbeknownst to management, shares a hotel space with a room's registered occupant to engage in criminal activity has an expectation of privacy in the room at least commensurate with the registered occupant's.").

Mr. Wheeler alternatively argues that he had a reasonable expectation of privacy in the room as an overnight guest there. *See Minnesota v. Olson*, 495, U.S. 91, 96–97 (1990) (finding that a defendant's status as "an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."). An overnight motel guest's expectation of privacy is founded on the more general principle that a

person has Fourth Amendment protections in a place other than his own home when he has a legitimate expectation of privacy in the premises he is using. *See Rakas v. Illinois*, 439 U.S. 128, 142–43 (1978) ("[A] person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place . . . [when he has] a legitimate expectation of privacy in the premises he was using.").

Here, the court finds that Mr. Wheeler had a legitimate expectation of privacy in his wife's motel room. He came to the room late at night (or early in the morning) and was asleep there when police arrived several hours later. He used his wife's room as a "private place to sleep." *See Olson*, 495 U.S. at 99. The Supreme Court has recognized that using a dwelling in this fashion creates an interest that provides Fourth Amendment protections against unreasonable governmental intrusion. *See Rakas*, 439 U.S. at 143 ("[The] capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."). The court thus concludes that Mr. Wheeler has standing to challenge the reasonableness of the government's searches here.

### B.     Fourth Amendment Standard

The Fourth Amendment[5] to our Constitution forbids unreasonable searches and seizures. *California v. Carney*, 471 U.S. 386, 390 (1985). When a defendant challenges the reasonableness of a search or seizure, the government bears the burden to prove the reasonableness of that search or seizure by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 (1974); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th

---

[5]     "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

Cir. 2001).  If the court determines that a search or seizure violated the Constitution, the exclusionary rule prohibits admission of the fruits of all evidence seized illegally.  *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

Mr. Wheeler asserts that the court should suppress the evidence found during the searches of Ms. Collins's motel room because the authorities conducted improper warrantless searches. Doc. 15 at 1.  The Supreme Court has held that warrantless searches are "presumptively unreasonable."  *See, e.g.*, *Kentucky v. King*, 563 U.S. 452, 459 (2011).  But "this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness."  *Id.* (internal quotation marks, brackets, and citation omitted). "Accordingly, the warrant requirement is subject to certain reasonable exceptions."  *Id.* (citation omitted).

Mr. Wheeler argues that his parole agreement cannot justify the first warrantless search of Ms. Collin's motel room.  The government disagrees, and invokes four exceptions to the warrant requirement to justify the search:  the protective sweep; the plain view doctrine; the plain smell doctrine; and the special-needs exception.  The government also invokes Ms. Collins's consent as a basis justifying the second search.

Ultimately, the court concludes that both warrantless searches of Ms. Collins's motel room complied with the Constitution.  The court explains the reasons for its conclusions, below.

### C.    First Search of the Motel Room

The government combines these four exceptions to the warrant requirement to justify the first search.  Namely, the government begins with the argument that officers initially collected a variety of observations under the first three exceptions—the protective sweep, plain view, and plain smell doctrines.  These lawfully collected observations—the government contends,

provided a basis for the officers to invoke a fourth exception to the warrant requirement—the special-needs exception.

As overview, the special-needs exception permits certain law enforcement officers to conduct warrantless searches because their duties present special needs that differ from other law enforcement officers. This exception applies when "special needs" of law enforcement officers "make the warrant and probable cause requirement impracticable." *United States v. Warren*, 566 F.3d 1211, 1215 (10th Cir. 2009). Probation and parole officers frequently qualify for this exception.

The underlying Kansas law here recognizes the special needs of parole officers. Specifically, it authorizes Kansas parole officers to conduct warrantless, suspicionless searches of parolees. *See* Kan. Stat. Ann. § 22-3717(k)(2) (requiring a Kansas parolee to consent to searches conducted by parole officers of the parolee's person and "effects, vehicle, residence, and property" whether such searches are conducted "with or without cause."). But as the discussion below explains, the facts here present an unusual twist. It appears that Mr. Wheeler's parole agreement gave Kansas's parole officers broader search authority than Kansas law actually authorized. But in the end, the court concludes that this variance does not matter. It doesn't matter because the officers properly gathered information under the first three exceptions to the warrant requirement invoked by the government. This information provided the parole officers with reasonable suspicion sufficient to invoke the special-needs exception as well.

### 1.    Protective Sweep, Plain View, and Plain Smell

The government first invokes the protective sweep exception. This exception allows law enforcement officers to protect themselves when making an arrest in a confined space. In this context, officers may "look in closets and other spaces immediately adjoining the place of arrest

from which an attack could be immediately launched" without probable cause or reasonable suspicion. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). If the law enforcement officers' search under this exception extends beyond immediately adjoining locations, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

As law enforcement officers arrested Mr. Wheeler, they conducted a protective sweep—looking in the closet, in the bathroom, and under the beds. All of these locations were in or immediately adjacent to the main motel room, and an attack could have been launched from any of them. *See id.* During this protective sweep, the government asserts, law enforcement officers saw incriminating items in plain view.

For the plain view doctrine to apply, the incriminating character of the evidence must be "immediately apparent" and the law enforcement officer must be "lawfully located in a place [where] the object can be plainly seen." *Horton v. California*, 496 U.S. 128, 136–37 (1990). A number of circuits have recognized as lawful the seizure of evidence found in plain view during a protective sweep. *See United States v. Lemus*, 582 F.3d 958, 959–60 (9th Cir. 2009) ("Because the area in which the police officers discovered the incriminating evidence 'immediately adjoin[ed] the place of arrest,' the officers were justified in conducting a search of that area without either probable cause or reasonable suspicion, *Maryland v. Buie*, 494 U.S. 325, 334 (1990), and anything in plain view that they discovered in the course of that search could be seized without violating the Fourth Amendment, *Horton v. California*, 496 U.S. 128, 136–37 (1990)."); *United States v. Taylor*, 497 F.3d 673, 679 (D.C. Cir. 2007) (holding that seizing a gun case found during protective sweep was proper under plain view doctrine); *United States v. Arch*,

7 F.3d 1300, 1303 (7th Cir.1993) ("[T]he investigating officer need not close his eyes to what he sees during the sweep, and any contraband that he observes in plain view may lawfully be seized."); *United States v. Baxter*, No. 91-5172, 1991 WL 207057, at *2 (6th Cir. Oct. 15, 1991) ("Once inside the house, the officers were then authorized to conduct a protective sweep of the house under *Maryland v. Buie*, 494 U.S. 325 (1990), and seize items in plain view. *Coolidge v. New Hampshire*, 403 U.S. 443, 466–67 (1971)."). The court finds these cases and the rationale of the doctrine persuasive.

Here, the law enforcement officers were lawfully located in the motel room conducting a protective sweep. Mr. Wheeler does not dispute that the officers could sweep the motel room. But he does dispute that the incriminating character of the bag of ammunition on the vanity counter was immediately apparent without manipulating or looking in the bag. The government provided a photograph of the bag of ammunition during the November 15, 2017 hearing. *See* Gov't Ex. 7. This photograph shows that the bag containing the ammunition appears to be a grocery-style bag made of thin plastic. Although the plastic is translucent, the ammunition is distinct and evidence. The bullets, themselves, are a distinct reddish color—likely due to a copper or brass jacket. In contrast, the shell casings are a metallic gray color. This combination makes each bullet distinct—so distinct that trained law enforcement officers credibly could recognize them at a glance. Indeed, KDOC Special Agent Joe Cox testified that when he entered the motel room to sweep it, the ammunition was immediately apparent to him. Doc. 30 at 147. The court thus concludes that Special Agent Cox saw the bag of ammunition in plain view and recognized it as possible contraband in the possession of a convicted felon; and so, it is admissible evidence against Mr. Wheeler.

During the protective sweep, Deputy Sheriff John Peterson testified that he also noticed some ceiling tiles and the top of the toilet tank appeared to have been disturbed. Although he did not observe any contraband or incriminating evidence from his plain view of these ceiling tiles and toilet tank, he lawfully observed that the ceiling tiles and toilet tank seemingly had been disturbed. For that reason, the court finds that the officers later could rely on Deputy Sheriff Peterson's observations to search above the ceiling tiles and inside the toilet tank under the special-needs exception.

The government also asserts that law enforcement officers smelled marijuana during the protective sweep. The Tenth Circuit has recognized: "The plain smell doctrine, in turn, is simply a logical extension of the plain view doctrine." *United States v. Angelos*, 433 F.3d 738, 747 (10th Cir. 2006) (finding that law enforcement officers could seize large duffle bags containing marijuana from defendant's residence, under the plain smell doctrine, where the officers (1) were lawfully in the residence, (2) had lawful authority to conduct a protective sweep of the entire premises, including the garage and basement, (3) smelled a strong odor of raw marijuana coming from duffle bags in the basement and garage, all of which were in plain sight, and (4) observed residue of marijuana on the duffle bags in the basement).

Here, officers testified that they smelled marijuana even before they entered the room—while still located outside the motel room's door. They also smelled it once they entered the motel room. Doc. at 30 (Officer Koch testifying that he smelled marijuana as he approached the motel room and the smell increased once he entered the room), 66 (Deputy Sheriff Peterson testifying that he smelled marijuana as he approached the motel room), 95 (Deputy Sheriff Ward testifying that he smelled marijuana as he moved toward the motel room), 156 (Special Agent Cox testifying that he smelled marijuana as he "went up to the [motel room] door."), 186

(Special Agent Westgate testifying that "[e]ven prior to walking into the motel room, I could smell a strong odor of marijuana coming from the room.").  These officers were lawfully located outside the motel room preparing to execute an arrest warrant when they first encountered this odor.  Also, they lawfully entered the motel room to execute the warrant and sweep the room for their protection.  They lawfully could perceive the odor of marijuana emanating from Ms. Collins's motel room.  For this reason, the odor of marijuana provided reasonable suspicion to search the room under the special-needs exception.

### 2.    Parole Agreement and Special-Needs Exception

Mr. Wheeler extensively argues that his parole agreement cannot justify the first search of Ms. Collins's motel room.  His parole agreement subjected him to suspicionless searches of his person, "effects, vehicle, and any other property under [his] control" by a Kansas parole officer.  Doc. 26 at 2.  Mr. Wheeler argues that this agreement cannot justify the search of the toilet tank, the nightstand, and Ms. Collins's purse in the first search.  His argument has two parts.  In the first, Mr. Wheeler argues that the parole argument impermissibly broadens the scope of the search beyond what the Kansas legislature has authorized.  So the KDOC parole officers could not search "property under his control."  Relying on this premise, Mr. Wheeler's second argument contends that the law enforcement officers could not search the room because it was not his residence.  Likewise, he contends, the parole officers could not search locations in the motel room—such as the toilet tank, the night stand drawer, and Ms. Collins's purse— because those items were not his property.

In the first part, Mr. Wheeler's argument focuses on the difference between the language used in the parolee search conditions in Kan. Stat. Ann. § 22-3717(k) and the actual search provision contained in Mr. Wheeler's parole conditions.

Kan. Stat. Ann. § 22-3717(k) provides:

(2) Parolees and persons on postrelease supervision are, and shall agree in writing to be, subject to searches of the person and the person's effects, vehicle, residence and property by a parole officer or a department of corrections enforcement, apprehension and investigation officer, at any time of the day or night, with or without a search warrant and with or without cause. Nothing in this subsection shall be construed to authorize such officers to conduct arbitrary or capricious searches or searches for the sole purpose of harassment.

(3) Parolees and persons on postrelease supervision are, and shall agree in writing to be, subject to searches of the person and the person's effects, vehicle, residence and property by any law enforcement officer based on reasonable suspicion of the person violating conditions of parole or postrelease supervision or reasonable suspicion of criminal activity. Any law enforcement officer who conducts such a search shall submit a written report to the appropriate parole officer no later than the close of the next business day after such search. The written report shall include the facts leading to such search, the scope of such search and any findings resulting from such search.

Mr. Wheeler's parole agreement contends:

12. Search:

Be subjected to a search of my person and my effects, vehicle, residence, and any other property under my control by parole officers, any authorized parole staff, and department of corrections enforcement, apprehension and investigation officers with or without a search warrant and with or without cause.

Be subjected to a search of my person and my effects, vehicle, residence, and any other property under my control by any law enforcement officer based on reasonable suspicion of violation of conditions of post-incarceration supervision, or reasonable suspicion of criminal activity.

Doc. 26 at 2. Mr. Wheeler's argument highlights the difference between the Kansas statute and his parole agreement. Namely, he contends that his parole agreement broadens the search conditions authorized by the Kansas statute by including the "property under [Mr. Wheeler's] control" instead of limiting it to Mr. Wheeler's "property." This unauthorized enlargement, he contends, is impermissible and requires the court to suppress evidence found within "property under his control."

14

To support the proposition that the search conditions impermissibly broadened what the Kansas legislature authorized—and thus require a suppression order—Mr. Wheeler cites *State v. Toliver*, 368 P.3d 1117 (Kan. Ct. App. 2016). In *Toliver*, the Kansas Court of Appeals analyzed an earlier version of the statute relied on by Mr. Wheeler's argument—Kan. Stat. Ann. § 22-3717. An earlier version of this statute limited suspicionless parolee searches to the parolee's person. *Toliver*, 368 P.3d at 1122–23. But because the *Toliver* defendant's parole agreement expanded suspicionless searches to include the parolee's residence, the court of appeals held that this expansion exceeded the limits authorized by the Kansas legislature. *Id.* at 1127. For that reason, the court of appeals directed the trial court to suppress evidence derived from a parole officer's search of Mr. Toliver's residence. *Id.*

Mr. Wheeler asks the court to apply a similar analysis here. But the government resists because the search of Ms. Collins's motel room was not a suspicionless search. Instead, the government notes, the bag of ammunition and odor of marijuana provided the parole officers with reasonable suspicion that Mr. Wheeler had violated a condition of his parole, or otherwise was involved in criminal activity. The government claims this reasonable suspicion was sufficient to justify applying the special-needs exception.

The Supreme Court has recognized the special-needs exception to the warrant requirement for searches of parolees, probationers and their homes. *Warren*, 566 F.3d at 1215. This exception applies when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Id.* (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)). The Tenth Circuit summarized the Supreme Court's rationale for establishing the special-needs exception in this fashion:

> In *Griffin* the Court considered a Wisconsin regulation that authorized any probation officer to search a probationer's home without a warrant "as long as his

supervisor approve[d] and as long as there [were] 'reasonable grounds' to believe the presence of contraband." [483 U.S.] at 871. The Court upheld a search of a probationer's home by probation officers acting under the regulation. It explained that probationers "do not enjoy the absolute liberty to which every citizen is entitled, but only. . . conditional liberty properly dependent on observance of special probation restrictions." *Id.* at 874 (brackets and internal quotation marks omitted). "These restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." *Id.* at 875. These goals "require and justify the exercise of supervision to assure that the restrictions are in fact observed." *Id.* Accordingly, "[s]upervision . . . is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.*

The Court expressed concern that this "special need" for supervision could be undermined if probation searches were subject to the usual requirements of a warrant and probable cause. With respect to the warrant requirement, the Court said that "the delay inherent in obtaining a warrant would make it more difficult for probation officials to respond quickly to evidence of misconduct." *Id.* at 876. And it observed that "the effect of dispensing with [the] warrant [requirement]" would be less offensive than in the typical criminal investigation because probation officers are not police officers and are "supposed to have in mind the welfare" of their clients. *Id.* As for the probable-cause requirement, the Court said that it "would reduce the deterrent effect of the supervisory arrangement" between probation officer and probationer because "[t]he probationer would be assured that so long as his illegal . . . activities were sufficiently concealed as to give rise to no more than reasonable suspicion, they would go undetected and uncorrected." *Id.* at 878. Also, said the Court, probation officers should be able to rely on information not usually considered by a judge in assessing probable cause. Because of the probation officer's "ongoing supervisory relationship" with the probationer, the officer should be able to "proceed on the basis of [the probation agency's] entire experience with the probationer . . . and . . . assess probabilities in the light of its knowledge of [the probationer's] life, character, and circumstances." *Id.* at 879. Accordingly, the Court believed that the probable-cause requirement would be "unduly disrupt[ive]" of the probation regime. *Id.* at 878. The Court concluded that the state's "special need[]" to supervise probationers made "[a] warrant requirement impracticable and justif[ied] replacement of the standard of probable cause by 'reasonable grounds.'" *Id.* at 876. It upheld the warrantless search "because it was conducted pursuant to a valid regulation governing probationers." *Id.* at 880.

*Warren*, 566 F.3d at 1215–16.

In Mr. Wheeler's case, no one can doubt that a valid regulation exists. As explained above, a Kansas statute controls the search of Kansas parolees. It requires every Kansas parolee

to subject his residence and property to a search conducted by a parole officer—even without cause. *See* Kan. Stat. Ann. § 22-3717(k)(2) ("Parolees and persons on postrelease supervision are, and shall agree in writing to be, subject to searches of the person and the person's effects, vehicle, residence and property by a parole officer or a department of corrections enforcement, apprehension and investigation officer, at any time of the day or night, with or without a search warrant and with or without cause."). And Mr. Wheeler unquestioningly agreed to this condition when he was released on parole by KDOC. But there are three aspects of the Kansas regulation that require close analysis here. They are: (1) the level of suspicion that the Kansas parole officers had developed; (2) application of the terms "residence" and "property" to the motel room and Ms. Collins's purse; and (3) the presence of other law enforcement officers at the motel room, *i.e.*, ones unrelated to Mr. Wheeler's supervision as a Kansas parolee, during the first search of the motel room.

### a.     Level of Suspicion

First, the Wisconsin regulation at issue in *Griffin* required the probation officer to develop reasonable suspicion as a prerequisite to conducting a search. But here, the Kansas regulation allows a suspicionless search by a parole officer. *See* Kan. Stat. Ann. § 22-3717(k)(2) ("Parolees . . . shall . . . be[] subject to searches of the person and the person's effects, vehicle, residence and property by a parole officer or a department of corrections enforcement, apprehension and investigation officer, at any time of the day or night, with or without a search warrant and *with or without cause*." (emphasis added)). And even if the Kansas regulation required reasonable suspicion, the KDOC parole officers had developed reasonable suspicion that Mr. Wheeler had violated conditions of his parole or was involved in criminal activity. They found a bag of ammunition in plain view in close proximity to Mr. Wheeler and smelled the odor

of marijuana plainly emanating from his room.  The totality of the circumstances provided the parole officers reasonable suspicion that a search would produce evidence of a parole violation or criminal activity by Mr. Wheeler.

About two minutes passed between the officers announcing their presence and their entry into the motel room.  And when the officers entered, they found that ceiling tiles and the top of the toilet tank had been disturbed.  Two minutes provided Mr. Wheeler time to conceal evidence of a parole violation or criminal activity anywhere in the room.  And the disturbed ceiling tiles and toilet tank top provided circumstantial evidence suggesting that Mr. Wheeler had used those two locations to conceal evidence of his wrongful conduct.  Judged by the totality of circumstances, the court finds that the parole officers had developed reasonable suspicion to search the motel room for evidence of parole violations or criminal activity committed by Mr. Wheeler.

### b.        Residence and Property

A second facet of Kansas law affects the analysis here.  The Kansas statute regulating searches of parolees allows a suspicionless search of the parolee's residence or property.  *See* Kan. Stat. Ann. § 22-3717(k)(2) ("Parolees . . . shall . . . be[] subject to searches of the person and the person's effects, vehicle, *residence* and *property* by a parole officer or a department of corrections enforcement, apprehension and investigation officer, at any time of the day or night, with or without a search warrant and with or without cause." (emphasis added)).  Here, the court cannot discern precisely where Mr. Wheeler kept his residence.  Indeed, Mr. Wheeler's Certificate of Release from KDOC lists his address as one "to be determine[d]".  Doc. 26 at 1.  But at the time of his arrest, Mr. Wheeler was staying in his wife's motel room.  He argued—and the court agrees—that he had an expectation of privacy in the motel room as an overnight guest

18

there.  Given the meager evidence available to them, it was reasonable for the parole officers to infer that the motel room, in effect, constituted his residence.  Mr. Wheeler has adduced no evidence suggesting a different location.  Indeed, he contends that he had been staying at the motel room.  The size of the room and the intimacy of the relationship between Mr. Wheeler and the person who had rented the room also legitimized the inference that it had served as his place of abode.

Mr. Wheeler argues that the search of Ms. Collins's purse was particularly unlawful because the purse was not—in the words of the Kansas statute—the parolee's property.  This argument relies on Mr. Wheeler's earlier assertion that his parole agreement impermissibly broadened the search conditions authorized by Kan. Stat. Ann. § 22-3717(k)(2) to include "property under [his] control."  Mr. Wheeler contends that the Kansas legislature only authorized suspicionless searches of *his property*.  So, his argument goes, *Toliver* forbids the parole officers to search anything other than Mr. Wheeler's property—namely, property under his control.  And if *Toliver* confined those officers to searching only Mr. Wheeler's property, he contends, the officers conducting the first search had no reason to believe that Ms. Collins's purse was his property.  This means, he concludes, that the search of Ms. Collins's purse could not be lawful under § 22-3717(k)(2).

The government responds by directing the court to a series of cases from California.  In California, "[a]n officer conducting a probation search, may search those portions of a residence over which the officer reasonably believes the probationer has joint control or access."  *People v. Ermi*, 156 Cal. Rptr. 3d 848, 849 (2d Cal. Dist. Ct. App. 2013) (citations omitted).  So, California courts generally have rejected the idea that a container designed for use by someone

other than the probationer may never be searched under the parolee's prerelease consent. *See,*
*e.g.*, *id.* at 849–50. *Ermi* typifies the reasoning invoked by the government's argument.

There, a police officer conducted a probation search of the probationer's apartment. The
probationer lived with his girlfriend and her purse was present in the apartment at the time of the
search. The police officer searched the purse and found drugs and drug paraphernalia it. The
police officer arrested the probationer's girlfriend. And the trial court denied her motion to
suppress the evidence found in her purse. On appeal, the girlfriend argued that the searching
police officer had no reason to believe the purse belonged to the probationer so the officer could
not conduct a probation agreement-based search of it. The court of appeal rejected the
girlfriend's theory. It affirmed the trial court's order refusing to suppress the evidence, finding
that the probationer had "joint control or access" to the purse. *Id.* at 281–82.

The government makes a similar argument here. It reasons that Mr. Wheeler had access
to the purse and other hiding places in the motel room. *Id*.; *see also People v. Smith*, 116 Cal.
Rptr. 2d 694, 699 (3d Cal. Dist. Ct. App. 2002) (deciding the question about the scope of the
probation search based on defendant's access to the purse and not whether the searching officers
identified the purse as female or gender-neutral).

Mr. Wheeler asks the court to adopt the reasoning of the Kansas Court of Appeals in
*Toliver*. He contends that the search of Ms. Collins's purse is squarely within the reach of
*Toliver*'s holding. And, he contends, that its holding recognizes that the parole officers could not
search "property under his control." The court is not persuaded by Mr. Wheeler's argument.
*Toliver* does not inform the correct analysis because, as explained above, the court already has
determined that reasonable suspicion existed to justify the search of Ms. Collins's motel room.
For the same reason, the court now finds that the search of Ms. Collins's purse was reasonable.

20

The analysis used in the California cases is persuasive because the totality of the circumstances provided KDOC officers with reasonable suspicion to believe Ms. Collins's purse might contain a gun.

Mr. Wheeler had several hours of access to all areas inside the motel room, including Ms. Collins's purse. And importantly, he had access to all those locations during the two minutes he refused to open the door once law enforcement officers had announced their presence outside his door. These circumstances reasonably suggested to the KDOC officers that Mr. Wheeler had an opportunity and a reason to access Ms. Collins's purse while the officers waited outside the motel room. Also, those officers observed a bag of ammunition in plain view on the vanity and a box of ammunition in the drawer of the nightstand. The presence of this ammunition provided officers reasonable suspicion to believe a gun was present in the motel room. Finding no gun in the immediate vicinity of the ammunition or on either occupants' person, it was reasonable for the officers to search other locations in the room for the gun. One officer searched the disturbed ceiling tiles. And KDOC Deputy Director Sackhoff searched the purse. Deputy Director Sackhoff found the gun in Ms. Collins's purse.

The California court of appeal reasoned that determining a search of a purse under a male parolee's condition is unconstitutional "would enable a [parolee] to flout a [] search condition by hiding drugs in a cohabitant's purse or any other hiding place associated with the opposite gender." *Ermi*, 156 Cal. Rptr. 3d at 850. The court agrees with this reasoning. The two-minute delay before law enforcement officers entered the motel room—combined with the disturbed ceiling tiles and toilet tank top—reasonably suggested that Mr. Wheeler had tried to conceal evidence of a parole violation or criminal activity. Ms. Collins's purse was one of many locations he had access to and could have used to conceal such evidence.

21

In sum, the totality of the circumstances here gave officers reasonable suspicion to believe Mr. Wheeler had access to Ms. Collins's purse and may have used that access to conceal evidence of his parole violation or criminal activity. The court thus holds that their search of the purse was authorized under the special-needs exception that applies to parolees.

<b>c.      Presence of Other Law Enforcement Officers</b>

Last, law enforcement officers who were not parole officers participated in the search of Ms. Collins's motel room. As our Circuit has recognized, "a police officer may participate in a search of a parolee's home by parole officers so long as the police officer is acting under the direction of a parole officer." *Warren*, 566 F.3d at 1217. Deputy Sheriffs Peterson and Ward conducted the search with the parole officers. They testified that they participated in the search under the direction of the parole officers. Doc. 30 at 77, 95. KDOC Special Agent Westgate led the efforts to execute the arrest warrant for Mr. Wheeler. Deputy Sheriff Ward knew he had to seek direction from KDOC Special Agent Joe Cox. Specifically, when Deputy Sheriff Ward found the marijuana in the top of the toilet tank, KDOC Special Agent Cox directed him to remove the marijuana from the water. *Id.* at 102–03. In such a confined space, the court finds that the Deputy Sheriffs were not conducting their own independent search. Instead, the evidence establishes that they were implementing decisions made by the parole officers. *See Warren*, 566 F.3d at 1217 ("[P]olice officers and parole officers are fungible when the former serve as mere implementers of decisions already made by the latter." (citation omitted)).

In sum, the search of Ms. Collins's motel room, including her purse, was constitutional under the special-needs exception. Mr. Wheeler was using the motel room as his temporary residence and he had access to Ms. Collins's purse. Under Kansas law, Mr. Wheeler's parole agreement allowed parole officers and other law enforcement officers acting under their direction

to conduct a suspicionless search of Mr. Wheeler's residence and property.  Here, the officers did not search without reasonable suspicions.  Based on the bag of ammunition in plain view and the odor of marijuana in plain smell, they had developed reasonable suspicions that Mr. Wheeler had violated his parole conditions or was involved in criminal activity.  Under the totality of the circumstances, including the two-minute delay before officers entered the room to find disturbed ceiling tiles and toilet tank top, officers had reasonable suspicion that Mr. Wheeler had access to all the locations in the room.  This includes Ms. Collins's purse.  Based on the totality of these circumstances, the search of Ms. Collins's motel room and purse was constitutional under the special-needs exception to the warrant requirement.  For this reason, the court denies the portion of Mr. Wheeler's motion that seeks to suppress the evidence derived from the first search of the motel room.

### D.     Second Search of the Motel Room

After the parole officers searched the motel room, Officer Salmon sought Ms. Collins's consent to search the room again.  And she gave her consent.  But Mr. Wheeler now argues that Ms. Collins's consent was coerced because Officer Salmon told her about the evidence found during the first, allegedly illegal search while trying to secure her consent.

To prove that a consent to search was not coerced, the government must establish, "from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal [search] and the consent." *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996) (internal quotation omitted).  Because the court already has determined the first search of the motel room was not an illegal one, no attenuation or break in causal connection is required.  Instead, the government simply must establish that Ms. Collins's consent was voluntary.  *See United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012) ("It is the

government's burden of proving that consent is given freely and voluntarily." (internal quotation and citation omitted)).

"When determining whether consent has been coerced, the court should not presume that consent was either voluntary or involuntary." *United States v. Yates*, 479 F. Supp. 2d 1212, 1215 (D. Kan. 2007) (citing *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993)). "The question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Some relevant factors include: "physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the [individual], the number of officers on the scene, and the display of police weapons." *United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012). "Whether an officer reads [the individual her] *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs [the individual] of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances." *Id.*

Here, no evidence suggests that Officer Salmon used any of the coercive tactics recognized in the governing case law, *i.e.*, physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone. Likewise, no evidence suggests that the officers employed any other coercive tactics to secure Ms. Collins's consent. Instead, the evidence establishes that Officer Salmon was truthful and straightforward in his dealings with Ms. Collins. He explained what officers had found during the first search[6] and asked for her consent to search the room again. When she asked what would happen if she did

---

[6]     *See* note 4, *supra*.

not give her consent, Officer Salmon replied that he would hold the room and apply for a search warrant. But also, he told her that she should not factor that plan into her decision and told her at least twice she could refuse consent.

Also, there was nothing inherently coercive about Officer Salmon's request to Ms. Collins. When she needed to use the restroom, he let her do so even though she made her request in the middle of the consent discussion. And there were only three officers in the room when the consent discussion took place. Officer Salmon sat next to Ms. Collins while he spoke to her. And Special Agent Knooiheuizen and Officer Koch stood across the room from her. None of the officers' presence was threatening.

Ms. Collins memorialized her consent by signing a form. This act generally demonstrates voluntariness. *See Eidson v. Owens*, 515 F.3d 1139, 1147 (10th Cir. 2008) ("A signed consent form is indicative of a voluntary consent."); see *also United States v. Ramos*, 194 F. Supp. 3d 1134, 1180 (D.N.M. 2016) ("[A] consent-to-search form does not completely resolve the question whether the search was voluntary, but it is a factor weighing strongly in favor of finding that the search was voluntary." (citation omitted)). Officer Salmon read the consent form to Ms. Collins, which re-iterated her right to refuse consent. Gov't Ex. 8.

Based on the totality of the circumstances presented by the evidence, the court finds that Ms. Collins voluntarily consented to a second search of the room. This rendered the second search a constitutional one and so, the court denies the portion of Mr. Wheeler's motion that seeks to suppress evidence derived from it as well.

### E.    Inevitable Discovery

Last, even if the searches were unconstitutional, the government contends that the court should admit the evidence seized during these searches because its discovery was inevitable.

25

Although the exclusionary rule prohibits admission of the fruits of illegally seized evidence, there are exceptions to this rule.  One such exception is the inevitable discovery doctrine.  This doctrine permits a court to admit illegally seized evidence "if an independent, lawful police investigation inevitably would have discovered it."  *United States v. Owens*, 782 F.2d 146, 152 (10th Cir. 1986).  The court may apply the inevitable discovery doctrine

> when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means. [An] [i]nevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred.

*United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) (quoting *United States v. Souza*, 223 F.3d 1197, 1205 (10th Cir. 2000)).

The government argues that law enforcement officers successfully would have secured a search warrant if they had applied for it because:  (1) their protective sweep had located a bag of ammunition in plain view; and (2) the motel room smelled of marijuana even when the officers were stationed outside it.  The government thus asserts that a preponderance of the evidence establishes that all the evidence inevitably would have been discovered.  *See United States v. Martinez*, 512 F.3d 1268, 1273 (10th Cir. 2008) ("The burden rests on the government to prove by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."  (internal quotation and citation omitted)).

Mr. Wheeler responds that the inevitable discovery doctrine does not apply.  His argument directs the court to factors the Tenth Circuit has adopted to assess warrantless search situations.  These factors are:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable

26

cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000) (internal quotation marks and citations omitted).

The first and third factors are neutral ones here because the law enforcement officers never started the warrant process. The KDOC officers and the other officers that assisted them with the first search believed Mr. Wheeler's parole agreement justified a search of the motel room. And Officer Koch believed that Ms. Collins's consent justified his second search of the room. So the officers never sought a warrant. For these reasons, these factors are neutral.

The second factor—strength of showing of probable cause—favors the government. Aside from the bag of ammunition and the smell of marijuana, the amount of time Mr. Wheeler remained in the motel room after officers announced their presence, combined with the disturbed ceiling tiles and toilet tank top, provided additional probable cause to believe the room contained contraband or other evidence of illegal activity. The government had collected a strong showing of probable cause by the time the first search commenced.

The fourth factor (whether law enforcement "jumped the gun") also favors the government. The KDOC officers leading the search believed they had authority to search under the parole agreement. They also smelled marijuana as they approached the motel room. There are no facts to suggest they "jumped the gun" because they believed they lacked probable cause to search.

Applying these factors to the evidence, even if the officers illegally seized the contraband and other evidence they found in the motel room, the court finds that its discovery was

inevitable.  This conclusion provides yet another, independent reason to deny Mr. Wheeler's motion.

## III.    Conclusion

In sum, officers could conduct the first search of Ms. Collins's motel room based on a protective sweep, the plain view doctrine, the plain smell doctrine, and the special-needs exception.  Then, and independently, they were legally entitled to conduct the second search based on Ms. Collins's consent.  And last, even if those two searches had been conducted in an unconstitutional manner, the evidence derived from them would have been discovered inevitably.  For these reasons, the court denies Mr. Wheeler's Motion to Suppress.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Wheeler's Motion to Suppress (Doc. 15) is denied.

**IT IS SO ORDERED.**

**Dated this 14th day of February, 2018, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**